Ms. Johns. Thank you, Your Honor. May it please the court. My name is Celeste Johns and I'm here on behalf of the appellate Mr. Coleman. This case involves the question of under what sworn testimonial allegations which this court in Sutton called the least type of reliable hearsay of witnesses that are not there to cross-examine. It implicates Mr. Coleman's Sixth Amendment right of confrontation, the right to due process, and his rights under federal rule of criminal procedure 32.1 to confront adverse witnesses against him. Although this court has in some instances allowed for the admission of such testimony, the facts of this case do not fall within any of those prior precedents and are more like this court's holdings in Sutton and in Timmins, where the government could not demonstrate the ability to meet either prong of the bell test. When the government fails to produce a witness, the government must demonstrate a reasonably satisfactory explanation for not producing the witness. Not simply, we tried. We tried once. The government simply tried for one day to try to produce this witness. This court first noted that a reasonably... Ms. Johns, what about the fact that this particular witness, I think the record showed, had just recently become homeless? There's still methods, Your Honor, of trying to track the witness down. As a young law clerk, I learned many lessons about, in working litigation, having to track a witness down. That's why we have the subpoena process in the first place. And all the efforts that were done here were insufficient. Well, counsel, you can't subpoena someone if you can't locate them because they don't have an address. I mean, this isn't a case like Timmins, where, you know, there was one attempt to serve an address and it didn't work. I mean, here you don't know where to go to find the person. The subpoena doesn't help you in that case. But, Your Honor, I would say that the government would be rewarded for waiting until six days before the hearing to make its first attempt to try to subpoena the witness. And as the court... How many days early should it have started? Well, I think it was clear by June the 11th, I believe, when Mr. Coleman made it clear that he was disputing the Do you remember how early the attempt to serve the witness was in Timmins? In Timmins, the prosecutor said that they started ordering the subpoena, but they had delivered the subpoena to someone who was out on training. And then eventually, when it was actually attempted to be physically served, it was one day before the hearing. So again, here you have, in this case, you have the report made on June the 2nd. You have the preliminary revocation hearing on June the 11th. And then it's more than a month later that the first attempt is made to serve the primary witness needed at this revocation hearing. And to reward the government, I think, would set up sort of a carrot for the government to rely on, that if you have a witness that has some credibility problems, that has some issues in terms of the testimony that they would give, maybe their criminal history, that you're giving the government an out by saying, well, if they wait, if they wait until that person has moved, if they wait till that person has changed their phone number, if they wait until just a few days before the hearing, but they did give it one shot, which this court in Timmins said, one attempt is not reasonable. One attempt is not reasonable. And here, it may not have been the day before the hearing, but it was the week of the hearing on July 15th. And then they didn't even believe that she had moved out of state because the very next day on July the 16th, they filed, the government files its witness list. And in that witness list, which is supposed to be noticed to the other side, to the defendant of what to expect, they listed both Ms. House and Ms. Elam as witnesses and as residents of Kansas City, Missouri. And so therefore, as this court has said in other cases, it is up to... So what else were they supposed to do there? I mean, if they hadn't listed the witnesses, you would have objected if they called them, I assume, and they didn't know where she was, they knew her last address. So, I mean, that to me is not very compelling. I mean, if I was the prosecutor, that's probably what I would have done, even if I couldn't locate her. But, Your Honor, with all due respect, they did have the name, phone number, and address of Ms. Elam. They never went to her address. If they were such good friends, Ms. House may have been temporarily living there. Ms. Elam may have known where Ms. House could be located. And also, if this comes down to the assertion that the government implies in its brief that Ms. House was being uncooperative, this court has said for many years, going clear back to 1994 in ZempGraph, that that is not a sufficient reason. A witness's preference not to testify without the government demonstrating, not alleging, not just asserting, but the government demonstrating danger to that witness if they would testify, that that's not sufficient. Did this witness even, maybe correct me if I'm wrong, I thought this witness said, well, I don't want to press charges against him. But did she ever say, I don't want to testify against him at a revocation hearing? I don't recall that from the record, Your Honor, no. No, that she thought that he did not need jail time, he needed mental health, is what I recall Officer Warning and Detective Kahn both saying that she eventually said to them. Yes, sir, I'm sorry. Counsel, due to the time, could you turn from unavailability and discuss reliability? Yes, sir. I believe, even if it had been otherwise impractical or undesirable to call Ms. House and Ms. Elam, the government did not show reliability of the hearsay evidence. The one thing they primarily point to in their brief are the photographs that were sent by text message to Probation Officer Warning on that Tuesday. That Tuesday, the government says Monday in their brief, but June 2nd, 2020 was a Tuesday. And if this allegedly happened at 11.30 p.m. on Saturday night, May the 30th, going into 12.30 a.m. May the 31st, she waited one whole day, one whole business day, and then some time into that third day to contact anybody. And her first phone call isn't to 911. It's not to police. It's not to a medical personnel or an ambulance or an urgent care. It's to his P.O. to get him in trouble. And just like this court recognized in Timmons, motive, Ms. House's motive for getting him in trouble is relevant to evaluating that second prong and bell. Because in Timmons, there was also a demonstrated desire expressed by the ex-girlfriend to get Mr. Timmons in trouble. And that same motive was here clearly to try to get Mr. Coleman in trouble. But the photographs don't demonstrate where they happened, when they happened, how they happened, who inflicted those injuries. None of those, there's no cooperation. All three witnesses admitted that they had no cooperation to those allegations. And I'm already into my rebuttal time. If there's no further questions, if I could reserve the remaining time. Thank you. Mr. Coppe? May it please the court, I'm Phil Coppe and I'm arguing on behalf of the government. I think the court is pretty clear on the law. We have two of the judges here who have written, I think, the most recent and comprehensive opinions on this issue. The first being, of course, U.S. v. Sutton. The other one being the Timmons case. These are the cases that the other side is relying upon. With respect to, first of all, the question of whether it's impractical or not, I know she's relying very heavily on Sutton and Timmons, but those cases, it seems to me, couldn't be any further from what we have here. In relation, in response to Judge Kobus' question about when they first tried to look for the witness in Timmons, reading from his opinion, the day before the hearing, it provided the Dubuque Police Department with a subpoena for Berry, which, by the way, they never even attempted to deliver it, because it says the person who was supposed to get it never even received it. So I don't even think that's a borderline. I know the district court called it a borderline attempt, but it's no attempt at all. I don't know how many of you remember the gong show, and they had these stupid jokes with Chuck Berris, and he said, I ran away from home and my parents never found me. And then he paused and he said, because they never looked for me. And that's pretty much what you have in the Timmons case and the Sutton case, where there was virtually no attempts whatsoever. The government, for whatever reason, just thought they could come in and put the hearsay on. In this particular case, we had our probation officer going out with a subpoena at the only address we had for the woman, and the place is padlocked. It's corded up. Mr. Coffey, should we expect at least a second try? I mean, and I get that. You get there, she's not there, you don't know where she is. You tried. But that's the probation officer. There's no effort to reach out to law enforcement that may or may not be involved at this point. You've got a fair amount of time to continue to look. Why shouldn't a district court expect sort of a little bit more effort than a one try couldn't find her? Well, to answer your question, Judge, there was, of course, a second try. They still had a line of communication through the telephone, and they still thought she was cooperating. So they arranged to serve her, to meet her at a Walgreens, and guess what? She doesn't show up. But even at that, they don't stop. They continue to try to reach her by telephone, but she's either not answering or she has her phone disconnected. But what they learn before they lose communication with her is she's couch surfing, basically. That's what she tells her. She's moving from place to place. So they knew she wasn't with Miss Elam, or they didn't know really where she was. And secondly, then she says, I'm leaving town. Now, this court's case law, and I know, Judge Kelly, you had something to say about this in your dissenting opinion, I think it was, in one of the cases, Harrison, I believe, where you were saying that distance maybe by itself isn't enough. That simply because somebody is in Virginia doesn't mean that without some evidence of how hard is it going to be to get them here, how much is it going to cost, maybe we shouldn't just use linear distance as our test. Well, in this case, we had no clue where she was. Yeah, we listed her as Kansas City, but she told us she was moving. She could have been in Virginia. She could have been in Texas. We had no way of knowing. And so, plus, we knew that she wasn't being cooperative. Not that she was withdrawing her allegations. She never said he didn't do it. What she said was, I don't think, you know, initially she wanted him prosecuted, but then she came to the conclusion, as many domestic abuse victims do, she ultimately concluded, I don't want him to go to jail for this. He needs help. He needs treatment. That's not denying the allegations. That's simply saying, I know what's going to happen if I go testify. He's going to go to jail, and I would prefer that not to happen for whatever reasons. So, counsel, even if we agree with you that the government did enough to show House's unavailability, what evidence shows reliability? All right. A couple of things. And, again, I think this distinguishes the case from Simmons and, excuse me, Timmons and Sutton, where they found no reliability. Here, what we had was, we not only had her making three extremely consistent statements to two different police officers and the probation officer, we had sets of photographs that showed the injuries, and I know that there's been a suggestion that maybe they were self-inflicted, but she had a bite mark on her face. How do you self-inflict a bite mark? I mean, she had actual, real injuries, which were documented, and so to say that now we don't know who did it, it's like, well, what are the probabilities that she either, A, had somebody deliberately inflict them, or that a random person inflicted them, and then... Well, counsel, there is someone that knew, and that's the cousins. I'm sorry? That's who? There are some witnesses that would have known, and that's the cousins. And were they ever contacted? Well, we didn't know who they were. According to her statement, the victim, she didn't know who the cousins were, and there's no indication. I think we had a phone number for Ms. Elam that didn't work, and so that was it. So there was no indication on the record that we had any way, I mean, obviously we would have or we could have, corroborating with other witnesses, but our point here is that when you look at, I know there's cases that say that unsworn statements are the least reliable form of corroboration, but I think it's important to look at what you had. Because when you're looking at reliability, you have to consider that in light of the totality of the circumstances. And when you look, for example, at why these out-of-court statements weren't found to be reliable in Sutton, weren't found to be reliable in Timmons, first take a look at Sutton. In Sutton, which I know Judge Kelly is familiar with, you had a situation where they called three witnesses, A, that everyone even really tried to look at, B, three witnesses who looked like they might have been more involved in the assault than the actual person, Sutton, who was having his probation revoked. I mean, blood under the fingernails, surveillance cameras, inconsistent statements. They had, not only did they have out-of-court statements that looked like they weren't reliable, but it almost looked like these individuals that the government was using were actually the ones who were involved. In fact, all three had been fingered or identified as being the assailants. And there was evidence, I think, that one of them, this clinician, blood under her fingernails, blood in various parts of her house. You don't have that here. You have an individual who says, this is what happened, and the photographs confirm it. And then you get to Timmons. And in Timmons, you had a situation where the police are investigating. You have the defendant saying, I didn't do it. He got a witness that said he didn't do it. There are several witnesses who said he didn't do it. And nothing. And I think it's also, in terms of connection here, I think it's significant. You have the defendant writing the court a letter, basically saying, promising to stay away from her, only denying that he pulled the gun, nothing else, talking about her teeth, saying they're false, and asking the court, not for justice, for mercy. That, to me, is something I think the court could and did take into consideration in determining whether there was corroboration. And that's absent from both the cases. In Sutton, the defendant, when he was interrogated, said he had nothing to do with it. In Timmons, he came into court, said he had nothing to do with it. I think that they can take what our defendant was saying, what our defendant was telling the court, read between the lines and say, hey, it would have been pretty easy for him to say, I wasn't there, I don't know this person, or if I do, it never happened. It's not what he said. So if I'm the judge, I'm thinking, hey, he's not really denying it. He seems to be conceding it. And again, we don't have the kind of contrary evidence that we had in Timmons, that we had in Sutton, that really makes a person say, whoa. And the other thing about, you know, she had a motive. I mean, to a certain extent, any victim is going to have some sort of animus against the other, the person she said did the crime, against her. But in this case, her animus wasn't so great  she changed her mind about, you know, even though she didn't deny he did it, it's like she changed her mind about wanting him prosecuted. So in any event, I don't think this case is Timmons. I don't think this case is Sutton. This is a different case where we have an impractical, it's impractical to call her. And I think we have reliable evidence here. So I would urge the court to affirm. Thank you. Thank you. Ms. Johns has some rebuttal. We'll now hear from you. Yes, Your Honor. Thank you. First to the first prong. There is not, for this court to sanction, the very little effort that the government, the government put into no effort. Mr. Coppi refers to Officer Warning as his probation officer. She's not. She's a probation officer that works for the court. They, as Your Honor pointed out, there was no effort on the part of law enforcement to use their many resources, their many databases, to see if Ms. House or Ms. Elam had utilities in their name, if they had phone numbers in their name, if there were other ways of tracking them down. That's why we have the subpoena process. People have to be tracked down. Also, as to the second prong, so that burden wasn't met by the government, and it is their burden. As to the second prong on reliability, you have to do a whole lot of, as Mr. Coppi said, reading between the lines to even get, you cannot get enough reading between the lines to tie the photographs, the statement, two and a half days later, where Ms. House never called law enforcement herself until suggested by the probation officer to do so. She never sought medical treatment. There is no indication, there's no forensic evidence in the record at all to show that that mark on her forehead is a bite mark. There is nothing that ties, there's no forensic evidence or medical records or anything that ties those injuries to an assault that had occurred. And as for Mr. Coleman's statement, there's no admission of responsibility at all. He's just simply saying, I'll stay away from this person who's making these accusations against me. He says specifically, she lied. And she lied because she was mad, he said, because they were not together anymore and he was seeing somebody else. He says her teeth came out, they false. False teeth do come out of your mouth. And even in the record, in the testimony of Officer Warning and of Detective Kan, Ms. House admitted to them that she had no idea where the injuries to her teeth came from. She did not even attribute the injuries to her teeth to Mr. Coleman. And I apologize, I see that my time has run out. If there are no further questions, I would ask the court to reverse the ruling of the district court. As it did in the relief it granted in the Johnson case, we would ask that no further record be allowed to be developed. And I thank the court for its time and consideration. Thank you both to counsel for your arguments here today and for your briefing on the matter. And we will take it under advisement.